UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK WILSON,

        Plaintiff,

v.

CORIZON HEALTH, INC., *et al.*,

        Defendants.
                                /

Case No. 1:18-cv-1138

Hon. Paul L. Maloney

### REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. This matter is now before the Court on "Defendants Corizon Health, Inc.; Suzanne Howard, M.D.; Peter Sices, M.D.; and Corey Grahn, N.P.'s Motion for summary judgment" (ECF No. 34).

        **I.**        **Plaintiff's remaining claims**

As an initial matter, plaintiff's "First Amended Verified Civil Rights Complaint pursuant to Title 42, U.S.C. § 1983" dropped claims against all defendants except for Suzanne Howard, M.D. *See* Amend. Compl. (ECF No. 32). This is reflected in the docket sheet which lists Dr. Howard as the only remaining defendant in this case as of April 29, 2019. The amended complaint contained two counts, Count I (retaliation in violation of the First Amendment) and Count II (deliberate indifference in violation of the Eighth Amendment). In his reply brief, plaintiff stated that he "agrees to voluntarily dismiss his First Amendment Retaliation claim against Defendant Suzanne Howard, M.D. under Fed. R. Civ. P. 41(1)(a)." *See* Reply (ECF No. 41).

1

Accordingly, the only issue before the Court is plaintiff's deliberate indifference claim against defendant Dr. Howard.

## II. Plaintiff's amended complaint

Plaintiff set forth the following allegations in his verified amended complaint which relate to his remaining claim:

a. On October 27, 2017, while situated at the Michigan Reformatory Correctional Facility [RMI], Plaintiff severely twisted and rolled his left ankle, resulting in excruciating pain;

b. Upon being examined by a Health Care Services staff person who was not a medical doctor, it was determined that Plaintiff had suffered a sprained ankle and was prescribed an Ace Wrap, crutches, ice, and served his meals inside the housing unit until he could be examined by a doctor;

c. On November 9, 2017 Plaintiff was examined by Defendant Howard, a medical doctor, who stated to Plaintiff that he had only suffered a sprained ankle, placed the ankle in a soft cast and scheduled him for an X-Ray for November 13, 2017;

d. On November 15, 2017, Plaintiff was informed that his X-Ray examination revealed negative findings and he was instructed to continue with rehabilitative exercises and to take Tylenol for pain;

e. Over the course of the ensuing weeks Plaintiff submitted numerous written requests to Health Care Services seeking pain relief treatment and the reinstatement of his special accommodation notices (SANS) for medically necessary assistive devices which had been revoked on December 21, 2017;

f. On February 1, 2018, Plaintiff was examined by Defendant Howard, who noted the appearance of excessive swelling in Plaintiff's left ankle more than 12-weeks after the reported injury;

g. At the request of Defendant Howard, Corey Grahn, a nurse practitioner, examined Plaintiff's injured ankle and concurred with Defendant Howard's finding of the above-described swelling and ordered an magnetic resonance imaging examination ("MRI") of Plaintiff's injured ankle;

h. On February 5, 2018, Plaintiff was again examined by Defendant Howard and was informed that the request for an MRI had been denied;

2

      i. On February 22, 2018, Plaintiff was summoned to Defendant Howard's office, who, while sitting in a chair situated behind her desk conducted an ostensible examination of Plaintiff's injured and announced that she did not see any swelling, to which Plaintiff responded, "How can you possibly examine me while you are sitting behind your desk?";

      j. Defendant Howard thereafter proceeded to don examination gloves and examined Plaintiff 's injured ankle, noting that previously-observed swelling had not abated;

      k. Defendant Howard thereafter began physically contorting Plaintiff's ankle in various positions, causing Plaintiff to scream in such anguish that Mr. Grahn intervened and admonished Defendant Howard that such a course was medically unwise in the absence of a definitive diagnosis of the nature of Plaintiff's injury;

      l. Defendant Howard thereafter revoked Plaintiff's SANS for meals-in, which forced him to have to have to traverse the prison yard to go to the dining hall on his severely injured ankle;

      m. During the five-day period of February 22, 2018 through February 26, 2018, Plaintiff, suffering from the excruciating pain in his injured ankle, was unable to perambulate to the dining hall for any of the thrice-daily meals . . .

      o. On March 29, 2018, an MRI examination was performed on Plaintiff's injured ankle, the results of which were compromised by the fact that, as expressly noted by the MRI technician, "the delay in getting the MRI," which made it significantly more "difficult to get the best reading results.";

      p. On April 7, 2018, Plaintiff was admitted to McLaren Hospital due to severe hypertension caused by the pain in his injured ankle and Dr. Bohrer, a cardiologist, orthopedic and neurologist specialist informed him that his review of the MRI examination results revealed that Plaintiff had suffered severe nerve damage to his ankle and that the MDOC should have ordered EMG testing at a much earlier date;

      q. On April 16, 2018, Defendant Howard told Plaintiff that "that little stunt you pulled, getting a C.T. scan cost the state a ton of money," and she announced that she was discontinuing his prescription for Naproxen, the only pain medication that had been made available to him;

      r. On June 5, 2018, Plaintiff was again examined by Defendant Howard, who, while now admitting that Plaintiff had suffered severe nerve damage, nevertheless issued him a prescription for Cymbalta, a medication which is neither indicated for nerve damage or pain relief[.]

3

Amend. Compl. at PageID.131-133. This matter is now before the Court on defendant Dr. Howard's motion for summary judgment.

### III. Motion for summary judgment

### A. Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Here, plaintiff filed a "verified complaint," which has the same force and effect as an affidavit for purposes of

responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). Finally, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Eighth Amendment claim

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). In other words, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. When a prisoner received treatment for his condition, the prisoner must show that his treatment was "so woefully inadequate as to amount to no treatment at all." *See Mitchell v. Hininger*, 553 Fed. Appx. 602, 604-05 (6th Cir. 2014), quoting *Alspaugh v. McConnell*,

5

643 F.3d 162, 169 (6th Cir. 2011) (internal quotation marks omitted).

A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer*, 511 U.S. at 834. A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### C. Discussion

Not unexpectedly, Dr. Wilson's sworn statement provides a substantially different account of plaintiff's treatment:

> 3. On November 9, 2017, I saw Mr. Wilson for a chronic care visit regarding cardiovascular visit. I also examined Mr. Wilson's ankle at this visit. I documented that his range of motion was poor, and the ankle was tender. I ordered x-rays of his foot and ankle. Health care provided Mr. Wilson with crutches.

4. The x-ray examination was complete [sic] on November 13, 2017. I noted that the x-rays showed no fracture.

5. On February 1, 2018, I saw Mr. Wilson regarding his ankle again. I reordered crutches or Mr. Wilson and ordered ice and Naproxen. I also gave him a lay-in for meals.

6. I also requested an MRI; however, utilization management did not approve the MRI and suggested immobilization and reevaluating the ankle in two weeks. I explained this alternative treatment plan to Mr. Wilson and planned to see him again two weeks later.

7. On February 22, 2018, I saw Mr. Wilson for his follow-up visit. He reported no change in his condition. I re-requested the MRI, and utilization management approved it.

8. I renewed his Naproxen on March 16, 2018.

9. On March 30, 2018, I reviewed the MRI report, which indicated, "Unremarkable Left ankle." I recommended ankle exercises to prevent a frozen ankle joint. I discontinued the splint and crutches "to mobilize the tissues and joints to prevent further problems."

10. On April 2, 2018, Mr. Wilson complained of severe pain. I explained that using crutches too long may be resulting in a frozen ankle. I ordered a cane for two days, and nursing staff provided handouts on range of motion. He returned the cane on April 4, 2018.

11. On April 16, 2018, I ordered Lisinopril, Naproxen, and a lower spine x-ray, which was normal.

12. On May 8, 2018, I completed a chart review/med re-view. I reordered Mr. Wilson's medications and ordered a follow-up appointment on or about May 16, 2018.

13. On May 17, 2018, Corey Grahn, N.P. saw Mr. Wilson at my request for purposes of a second opinion examination. Based upon the examination, N.P. Grahn advised me that he suspected no neuropathy but indicated that tendonitis was possible. He deferred the plan of care to me.

14. On June 5, 2018, I saw Mr. Wilson again. I ordered ted hose for his left leg and Cymbalta to treat his pain. I ordered a follow-up visit in one month. I also ordered labs, but Mr. Wilson refused his lab draw. I had no further involvement in his medical care.

7

15. On June 28, 2018, Mr. Wilson transferred to a different MDOC facility where his treatment continued under the care of other medical providers.

Dr. Howard Aff. (ECF no. 34-3). Dr. Wilson's statements are supported by the extensive medical records filed in support of defendants' motion. *See* Medical Records (ECF No. 35, PageID.303-492).

While Dr. Howard provided most of plaintiff's medical treatment, former defendant Peter Sices, M.D. also treated plaintiff in December 2017 and January 2018. Dr. Sices ordered a repeat x-ray on December 21, 2017 (in case a hairline fracture was missed on the previous x-ray), ordered crutches and stated that plaintiff needed "no weight-bearing" for at least six weeks whether he had a fracture or a sprain. Dr. Peter Sices Aff. (ECF No. 34-4, PageID.175). *See* Medical Record at PageID.344-346. The x-ray was completed on December 27, 2017, and revealed "normal left ankle." Dr. Sices Aff. at PageID.175. Plaintiff only used the crutches for a few days, returning them on January 5, 2018. *Id*. *See* Medical Record at PageID.355 (noting that plaintiff carried in his crutches to the visit; "He admits not using them and states that he refuses to use them."). As discussed, Dr. Howard re-ordered crutches on February 1, 2018. Medical Record at PageID.377. On that date, plaintiff complained that walking upstairs and downstairs caused pain and that his left shin throbbed all of the time. *Id.* at PageID.373.

There is no evidence that plaintiff's hospital visit in April 2018 was related to his ankle. Clinical notes from the hospital (McLaren Greater Lansing) and the MDOC indicate that plaintiff had an inpatient hospital stay for chest pain/elevated blood pressure. Medical Records at PageID.434-439. Neither party points to any medical record containing an opinion which cardiologist Dr. Bohrer allegedly gave with respect to plaintiff's ankle MRI.

Based on this record, Dr. Howard did not fail to treat plaintiff's ankle in violation of the Eighth Amendment. Plaintiff had two x-rays which revealed a normal ankle. Nevertheless,

8

Dr. Howard: requested an MRI; implemented an alternative treatment plan as directed in lieu of the MRI; and re-requested the MRI (to evaluate for a subtle injury, avulsion of ligament or other reason for a non-healing sprain). Medical Records at PageID.378-381, 384-385, 398. The MRI results for plaintiff's ankle were "unremarkable." *Id.* at PageID.413. In addition, the medical record reflects that plaintiff was not compliant with medical instructions. Plaintiff refused to use the crutches as instructed by Dr. Sices (which Dr. Howard re-ordered in February 2018). On April 2, 2018, plaintiff was advised that the ankle MRI was unremarkable and was prescribed a cane to prevent a "frozen ankle;" however plaintiff returned the cane after two days. PageID.428-430. Then, plaintiff refused a lab draw in June 2018. PageID.480. Plaintiff cannot disregard doctors' orders and then claim that the doctors were deliberately indifferent to his serious medical needs.

Finally, plaintiff presented no expert evidence to support his claim that he "had suffered severe nerve damage," or that Dr. Howard issued him an improper medication, *i.e.*, a prescription for Cymbalta, "a medication which is neither indicated for nerve damage or pain relief." Dr. Howard noted that plaintiff had pain and "late effect" symptoms from a sprain of the left ankle, aggravated in part by a heart catheterization procedure which used the left groin, and that the doctor explained to plaintiff that Cymbalta was FDA approved for pain and is used to treat peripheral neuropathy and medical conditions that lead to neuropathy. Medical Records at PageID.467-469. In this regard, Dr. Howard was treating plaintiff for a number of other medical conditions in addition to the sprained ankle. According to plaintiff's medical history, as of June 28, 2018, he was being treated for hypertension, three aortic aneurysms, "cardiac and circulatory conditions," and mental health, and that his treatment included compression socks and nine prescription medications. *Id.* at PageID.487-489.

In summary, plaintiff did not establish either the objective or subjective component of an Eighth Amendment claim. The record reflects that Dr. Howard provided on-going medical care to plaintiff's ankle and his other medical conditions. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). For his part, plaintiff did not comply with the doctors' instructions. While it appears that plaintiff disagreed with how Dr. Howard (and Dr. Sices) treated his sprained ankle, this disagreement cannot support a federal constitutional claim. "[A] patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017). Even if plaintiff claimed medical malpractice, he has not presented an affidavit from a medical expert that would support a malpractice claim against Dr. Howard. For these reasons, defendant Dr. Howard's motion for summary judgment should be granted.

### III. Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (ECF No. 34) be **GRANTED** and that this action be **TERMINATED**.

Dated: February 27, 2020              /s/ Ray Kent
                                      RAY KENT
                                      United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).